UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                :

MEDACIST SOLUTIONS GROUP, LLC,          :

                Plaintiff and Counter-Defendant,    :

                                              :                      19-CV-1309 (JMF)

         -v-                              :

                                              :          OPINION AND ORDER

CAREFUSION SOLUTIONS, LLC,            :

                Defendant and Counter-Plaintiff.    :

                                              :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In 2014, Plaintiff and Counter-Defendant Medacist Solutions Group, LLC ("Medacist") and Defendant and Counter-Plaintiff CareFusion Solutions, LLC ("CareFusion") entered into an agreement pursuant to which CareFusion was to act as the "exclusive reseller" of drug diversion analytics software developed by Medacist. As the opioid crisis in the United States worsened, and the market for such software became more competitive, CareFusion developed its own drug diversion analytics software. Perhaps not surprisingly, the relationship between Medacist and CareFusion thereafter soured, and this lawsuit — with competing claims for breach of contract and the like — followed. Now pending are competing motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and competing motions to exclude expert testimony. For the reasons that follow, CareFusion's motion for summary judgment is granted in part and denied in part; Medacist's cross-motion for summary judgment is granted in its entirety; CareFusion's motion to exclude the testimony of Medacist's expert is denied; and Medacist's motion to exclude the testimony of CareFusion's experts is granted in part and denied in part.

## BACKGROUND

The following facts, taken from the pleadings and the admissible materials submitted by the parties in connections with their cross-motions for summary judgment, are either undisputed or described in the light most favorable to the relevant non-moving party. *See Simon v. City of New York*, 893 F.3d 83, 91 (2d Cir. 2018).

### A. The Reseller Agreement

Medacist, owned by David and Lorraine Brzozowski, develops and sells drug diversion analytics software, which collects and interprets data related to the dispensing of medication and allows healthcare facilities to track potentially improper dispensing of medication. *See* ECF No. 49 ("TAC"), ¶¶ 1, 6. One of Medacist's products is called the RxA Solution, a suite of software and services that makes use of a patented drug diversion detection algorithm. *See id.* ¶ 6; ECF No. 84 ("Medacist's 56.1 Resp."), ¶ 1.[1] CareFusion offers products and technologies to healthcare providers, including the Pyxis MedStation, an "automated medication dispensing cabinet," and Knowledge Portal (together known as the "CF Offering"), which allows medical professionals to access medication stored in the Pyxis MedStation. Medacist's 56.1 Resp. ¶¶ 4-5; TAC ¶ 7.[2]

In 2014, Medacist and CareFusion entered into the RxAuditor Reseller Agreement (the "Reseller Agreement"), pursuant to which Medacist appointed CareFusion to act as its

---

[1]     Medacist filed its response to CareFusion's Rule 56.1 Statement and its counterstatement of additional material undisputed facts as a single document, with each statement starting at paragraph one. To distinguish between the two, the Court will refer to Medacist's response to CareFusion's 56.1 Statement as "Medacist's 56.1 Resp." and will refer to Medacist's counterstatement as "Medacist's 56.1 Counter-Stmt."

[2]     In 2015, CareFusion was acquired by Becton, Dickinson and Company, *see* Medacist's 56.1 Resp. ¶ 5, and is referred to at times in the record by that name (or "BD"), *see, e.g.*, ECF No. 75-40, at 2. For clarity, the Court refers to it throughout this Opinion as "CareFusion."

"authorized exclusive . . . reseller" of the RxA Solution and CareFusion agreed to "market[] and sell[] the RxA Solution as part of the CF Offering."  ECF No. 75-8 ("Reseller Agreement"), § 2.1.  In particular, CareFusion agreed to sell the RxA Solution to healthcare providers in the form of subscription agreements, which — absent Medacist's written consent — were required to contain substantially the same terms and conditions as a model attached to the Reseller Agreement.  Reseller Agreement §§ 4.1-.2.  The model subscription agreement consisted of a contract to be entered into by CareFusion and the subscriber for a term of sixty months and provided for automatic renewal at the end of that term unless the subscriber opted out of such renewal in writing.  *See* ECF No. 75-10 ("Schedule") 4, at 66-67.  Under the Reseller Agreement, CareFusion determined the price at which the RxA Solution would be sold to subscribers, consisting mainly of hospitals, with Medacist receiving a fixed fee.  Reseller Agreement § 8.1.  Medacist, for its part, agreed to make the RxA solution available to customers, to provide set-up services for new subscribers, and to provide technical support.  TAC ¶ 11.

To the extent relevant here, the Reseller Agreement included certain limitations on CareFusion's marketing and sales activities.  For instance, Section 2.3 provided that, for the duration of the Reseller Agreement, the RxA Solution was to be "the only automated drug diversion reporting and analytics solution rights which are directly or indirectly sold, re-sold or recommended for use by CareFusion . . . in the Market, in connection with the CF Offering."  Reseller Agreement § 2.3.  It also provided that CareFusion could not "sell or resell any other technology . . . that competes with, or would, with reasonable likelihood, displace or distract from the sales of Subscriptions to the RxA Solution."  *Id.*  Under Section 3.2, Medacist and CareFusion agreed to "develop and finalize a written, joint go-to-market strategy document for the RxA Solution," defined as the "General Marketing Plan," and "a written, joint plan setting

3

forth specific strategies to effect . . . the upgrade of a specifically identified mutually agreed upon sub-set of prospective Subscribers who are then-currently customers of the CF Offering," defined as the "Customer Upgrade Plan." *Id.* § 3.2(a)-(b).  "As part of both the General Marketing Plan and/or Customer Upgrade Plan," entities "designated on Schedule 3.2(b)as [sic] . . . 'House Accounts'" could "not be solicited" by CareFusion.  *Id.* § 3.2(b) (emphasis omitted). In turn, Schedule 3.2(b) provided: "Notwithstanding anything to the contrary in this Schedule or the Agreement, CareFusion shall not sell or market to, pursue, solicit or engage, either directly or indirectly, any of the . . . House Accounts . . . at any time . . . ."  Schedule 3.2(b)(2)(a), at 53.

The Reseller Agreement, which became effective on November 11, 2014, was to last for five years, but it allowed for early termination after three years by either party "upon at least one hundred eighty (180) days' prior written notice to the other party."  Reseller Agreement § 9.1.  If CareFusion exercised this right to early termination, it would have to pay an early termination fee to Medacist: $750,000 if the termination was between the third and fourth anniversary of the agreement and $600,000 if the termination was between the fourth and fifth anniversary of the agreement.  *Id.*  Separately, Schedule 9.4 provided that "[w]ithin fifteen (15) business days" of the effective date of the Agreement, Medacist was to "place into" an escrow account "a list of" then-existing customers and that CareFusion would be "prohibited, directly or indirectly, [from] selling or marketing to, pursuing, soliciting or engaging" the customers on that list for 180 days following the effective date of termination if CareFusion terminated the Agreement early. Schedule 9.4, at 78.  Medacist failed to place the list into escrow.  Medacist's 56.1 Resp. ¶ 25.

**B. CareFusion's Sales of the RxA Solution and Development of HealthSight**

In May 2015, CareFusion entered into its first subscription for the RxA Solution under the Reseller Agreement. *Id.* ¶ 29.[3]  In total, during the life of the Agreement, CareFusion entered into over 1,000 RxA subscription agreements with healthcare providers.  ECF No. 96 ("CareFusion's SJ Reply & Opp'n"), at 12 n.6.  Although the Reseller Agreement specified the process by which CareFusion would submit subscription orders to Medacist, *see* Reseller Agreement § 5.1, CareFusion prepared a separate document as part of its procedure for billing pursuant to which Medacist was expected to promptly notify CareFusion when it had completed a subscriber's installation of the RxA Solution, *see* ECF No. 91-54 ("Order to Cash Process" or "OTC Process"); *see also* ECF No. 33 ("Counter-Compl."), ¶¶ 8-9.  By 2018, CareFusion complained that Medacist had fallen behind on providing these notices.  ECF No. 97 ("CareFusion's 56.1 Resp."), ¶ 103.

In or around late 2017, as the opioid crisis intensified, CareFusion decided to develop its own drug diversion analytics product, called HealthSight Diversion ("HealthSight"), which it planned to sell as part of a pre-existing data and inventory management platform.  Medacist's 56.1 Resp. ¶ 33.  CareFusion alleges that during a telephone call in October of that year, its General Manager of Dispensing Technologies, Jason Strohm, shared that fact with David Brzozowski, Medacist's President and Chief Executive Officer, and advised that CareFusion planned to release the new product in 2018.  ECF No. 71 ("CareFusion's 56.1 Stmt."), ¶¶ 6, 34.

---

[3]     The Reseller Agreement provided that CareFusion would commence marketing and selling the RxA Solution by December 1, 2014, but CareFusion apparently did not commence the marketing and sales program until 2016.  *See* ECF No. 75-15.  In August 2016, the parties entered into a settlement agreement, not relevant here, pursuant to which they agreed to waive and release certain claims, including any claims arising from the delay, against each other.  *See id.*

The following month, Strohm emailed David Brzozowski to advise that CareFusion planned to showcase HealthSight at an upcoming trade conference sponsored by the American Society of Health-System Pharmacists ("ASHP") at which Medacist also planned to appear.  ECF No. 75-20, at 2; *see also* Medacist's 56.1 Resp. ¶¶ 37-40.  Strohm advised that CareFusion was planning to announce that was "developing" and would "bring to market in the second quarter of 2018 a new diversion solution . . . to help [its] customers address controlled substance diversion."  ECF No. 75-20, at 2; *see also* Medacist's 56.1 Resp. ¶ 38.  At the conference, CareFusion demonstrated HealthSight to potential customers.  Medacist's 56.1 Resp. ¶ 39; CareFusion's 56.1 Resp. ¶ 60; ECF No. 91-32, at 47.  It did not, however, sell any version of HealthSight during the conference.

On December 20, 2017, Strohm emailed David Brzozowski reiterating that CareFusion was "developing [its] own diversion analytics offering to the market" and that CareFusion "intend[ed] to market [its] own product as well."  ECF No. 75-18, at 3.  Strohm stated CareFusion was "feeling pressure to send [a] termination notice in the coming days, only to start the clock on the 180[-]day" notice period required for early termination under Section 9.1 of the Reseller Agreement.  *Id.*  At the same time, Strohm noted that CareFusion's preference was not to terminate, but to negotiate an amended, non-exclusive agreement, and observed that "there is nothing stopping either [party] from continuing to re-negotiate the agreement post termination notice."  *Id.*  In response, David Brzozowski emailed that he "underst[oo]d the message [Strohm was] sending" and that, "[a]s long as negotiations" regarding a "non-exclusive license are fair," Medacist would "want that deal" and had "no intention of terminating" the agreement.  *Id.* at 2.  In December 2017 and early 2018, the parties engaged in discussions concerning an amended

Reseller Agreement that would have, among other things, permitted CareFusion to market and sell HealthSight.  *See* Medacist's 56.1 Resp. ¶¶ 50, 54.

## C.  CareFusion's Purported Termination of the Reseller Agreement

On February 1, 2018, as negotiations over a potentially amended Reseller Agreement continued, Scott Benjamin — CareFusion's counsel — sent a letter to Medacist stating: "By this letter, CareFusion . . . notifies you of its termination of the Reseller Agreement . . . under section 9.1 thereof."  ECF No. 75-35, at 2.  According to the letter, "[t]he effective date of this notice is deemed to be October 25, 2017," which was "four business days after" Medacist and CareFusion had "agreed in principle to amend the Reseller Agreement to, among other things, modify" the exclusivity provisions to allow CareFusion to market and sell HealthSight.  *Id.*  Benjamin stated that, "[b]ut for that agreement in principle," CareFusion "would have given notice of termination on October 25, 2017."  *Id.*  "Accordingly," he concluded, "the effective date of termination" — 180 days from October 25, 2017 — "is April 23, 2018."  *Id.*  In an email eight days later, David Brzozowski noted that he understood why the termination letter had been sent, but expressed confusion about "the October date."  ECF No. 91-30, at 1.  "Yes," he continued, "we did agree to try to work through a non-exclusive but we never agreed to change how termination works."  *Id.*

The parties continued their negotiations over amendments to the Reseller Agreement through October 2018, Medacist's 56.1 Resp. ¶ 54; ECF No. 75-1, at 172, but they were ultimately unsuccessful.  On November 9, 2018, Strohm sent Medacist a letter referencing the February 1, 2018 letter "by which CareFusion . . . notified Medacist . . . of CareFusion's election to terminate the Reseller Agreement" and the parties' unsuccessful negotiations thereafter.  ECF No. 75-39, at 3.  "Accordingly," the letter concluded, "the [Reseller] Agreement is terminated effective November 12, 2018."  *Id.*  The letter was accompanied by a check for $750,000, *see id.*

at 4, which Medacist deposited in a segregated bank account, *see* Medacist's 56.1 Resp. ¶ 57;
ECF No. 91-20, at 175.  Three days later, on November 12, 2018, CareFusion officially launched
the sale of HealthSight.  CareFusion's 56.1 Resp. ¶ 49.  On the same day, CareFusion prepared a
form letter that it sent to RxA Solution subscribers.  TAC ¶ 24; CareFusion's 56.1 Resp. ¶ 51.
The letter, after praising CareFusion's "3-year partnership with Medacist," stated that
CareFusion would "no longer offer[]" RxA Solution "as of November 12, 2018."  ECF No. 75-
40, at 2.  The letter also stated that CareFusion had developed its own "new" and "next-
generation diversion solution."  *Id.*  It then informed subscribers that there would "be no changes
to [their] contract[s] or how [they] utilize the product for the remainder of [the] term," except
that the "five-year [RxA Solution] term will not automatically renew when it expires."  *Id.*  The
letter noted that, "[a]t the end of [the] term," the subscribers would "have the option to receive a
quote for [CareFusion's] next generation diversion solution or to sign a new agreement directly
with Medacist."  *Id.*  Medacist, through counsel, sent a letter to CareFusion on December 2, 2018
objecting to the November 12 letter and demanding that CareFusion send a corrective notice
advising subscribers that their subscriptions remained unchanged.  ECF No. 91-21.  Benjamin
responded the next day that it was CareFusion's position that because the Reseller Agreement
was terminated and CareFusion was no longer a licensed reseller of RxA Solution, it could no
longer renew subscribers' subscriptions.  ECF No. 91-22, at 1.  This lawsuit followed.

## SUMMARY JUDGMENT MOTIONS

The Court will begin with the parties' cross-motions for summary judgment.  First,
CareFusion moves for summary judgment with respect to Medacist's claims for breach of
contract, breach of fiduciary duty, tortious interference with prospective business advantage, and
breach of the implied covenant of good faith and fair dealing, and moves to enforce a limitation-

of-liability provision in the Reseller Agreement.  *See* ECF No. 69.[4]  Second, Medacist cross-moves for summary judgment with respect to CareFusion's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.  *See* ECF No. 82.  After summarizing the legal standards relevant to the motions, the Court will address each in turn.

## A.  Legal Standards

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all

---

[4]    Medacist previously withdrew claims for tortious interference with existing contractual relations.  *See* ECF No. 60.

permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

Significantly, "[a]fter giving notice and a reasonable time to respond," a district court "may . . . grant summary judgment *for a nonmovant*."  Fed. R. Civ. P. 56(f)(1) (emphasis added); *see, e.g.*, *Duran v. La Boom Disco, Inc.*, 369 F. Supp. 3d 476, 480 (E.D.N.Y. 2019), *vacated and remanded on other grounds*, 955 F.3d 279 (2d Cir. 2020).  As the Second Circuit has held, however, formal notice is not required if the moving party is not "procedurally prejudiced" by the lack of notice.  *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139-40 (2d Cir. 2000).  "A party is procedurally prejudiced if it is surprised by the district court's action *and* that surprise results in the party's failure to present evidence in support of its position."  *Id.* at 139 (emphasis added).  The risk of such prejudice "greatly diminishe[s]" when the court's decision "is based on issues identical to those raised by the moving party" and "the moving party speaks to those issues in the course of the district court proceedings."  *Id.* at 140 (quoting *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)); *see also, e.g.*, *Obsession Sports Bar & Grill, Inc. v. City of Rochester*, 235 F. Supp. 3d 461, 466 (W.D.N.Y. 2017) ("Movant has 'sufficient notice' . . . where the issue upon which the court grants summary judgment for the non-movant is

the same issue that the movant briefed in support of its unsuccessful motion for summary judgment." (internal quotation marks omitted)), *aff'd*, 706 F. App'x 53 (2d Cir. 2017) (summary order).  Thus, "where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." *Bridgeway Corp.*, 201 F.3d at 140 (alterations omitted) (citing *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996)).

Finally, a court may grant summary judgment with respect to a contract claim "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see, e.g., Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (explaining that "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment" (internal quotation marks omitted)).  A contract is ambiguous if its language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks omitted).  Conversely, "a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings*, *N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.,* 9 N.Y.3d 264, 267 (2007)).  "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *O'Neil v.*

*Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994) (internal quotation marks omitted).

**B. CareFusion's Summary Judgment Motion**

Medacist alleges that CareFusion breached the Reseller Agreement in eight distinct ways and also brings claims for breach of fiduciary duty, tortious interference with prospective business advantage, and breach of the implied covenant of good faith and fair dealing.  *See* TAC ¶¶ 37-51, 61-69.  CareFusion moves for summary judgment with respect to all of Medacist's claims and moves also to enforce a limitation-of-liability provision in the Reseller Agreement.  *See* ECF No. 70 ("CareFusion's SJ Br."), at 17-25.  The Court will address each argument in turn.

**1. Breach-of-Contract Claims**

Medacist alleges that CareFusion breached the Reseller Agreement by (1) failing to provide sufficient notice of its early termination; (2) marketing HealthSight, a competitor to the RxA Solution; (3) soliciting House Accounts (that is, longtime Medacist customers); (4) violating the post-termination non-compete provisions; (5) unilaterally modifying subscription agreements; (6) failing to make its books and records available for an audit; (7) continuing automated drug diversion reporting in its CF Offering; and (8) failing to provide a real-time data agent interface for licensees.  TAC ¶ 40.  CareFusion purports to move for summary judgment with respect to all eight theories of breach, *see* CareFusion's SJ Br. 11, 25, but conspicuously fails to address the last three except, arguably, in a conclusory footnote, *see id.* at 17 n.11.  An argument "relegated to a footnote," however, "does not suffice to raise [an] issue."  *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (citing

cases).  Accordingly, to the extent that CareFusion moves for summary judgment with respect to Medacist's last three theories, the motion is denied, and the Court will analyze only the first five.

    **a.  Early Termination**

First, Medacist alleges that CareFusion breached the Reseller Agreement by attempting to terminate the agreement without providing "one hundred eighty (180) days['] prior written notice" as required by Section 9.1 of the Reseller Agreement.  TAC ¶ 40(b).  "The general rule is that, to be effective, a notice terminating a contract must be clear and unequivocal.  The focus is on whether the notice is sufficiently clear to apprise the other party of the action being taken." *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs.,* 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003) (citations omitted) (collecting cases); *accord Velo Holdings Inc. v. Paymentech, LLC* (*In re Velo Holdings Inc.*), 475 B.R. 367, 380-81 (Bankr. S.D.N.Y. 2012); *Accu-Weather, Inc. v. Prospect Commc'ns, Inc.*, 644 A.2d 1251, 1255 (Pa. Super. Ct. 1994); *see also, e.g., Ellivkroy Realty Corp. v. HDP 86 Sponsor Corp.*, 556 N.Y.S.2d 339, 340 (1st Dep't 1990) (holding that summary judgment is properly denied when termination notices are not "clear, unambiguous[,] and unequivocal").  Significantly, however, "[t]he related conduct of the parties, including conduct between the giving of notice and the actual date of termination, may be considered in determining whether there has been a clear and unequivocal termination."  *Morris Silverman Mgmt. Corp.*, 284 F. Supp. 2d at 974 (citing cases); *accord Velo Holdings*, 475 B.R. at 380-81.

Here, whether CareFusion is entitled to summary judgment with respect to Medacist's first theory of breach turns on whether its February 1, 2018 letter was a valid and effective notice of termination, there being no dispute that it was given more than 180 days before the November 12, 2018 purported termination.  In a vacuum, the letter might well have qualified as a "clear and unequivocal" notice of termination, as it stated in no uncertain terms that "CareFusion . . .

notifies [Medacist] of its termination of the Reseller Agreement . . . under section 9.1 thereof."
ECF No. 75-35, at 2.  But the letter also stated that the "effective date of termination" was April
23, 2018, *id.*, and CareFusion indisputably continued to perform under the terms of the Reseller
Agreement even after that date — indeed, until November 12, 2018, 284 days after the February
1, 2018 letter.  A reasonable jury could conclude that the combination of CareFusion's letter and
its later conduct "constituted a message that was both mixed and ambiguous," *Accu-Weather*,
644 A.2d at 1255, and, thus, "could find that a clear and unequivocal invocation of the
termination clause did not exist" as of November 12, 2018, when CareFusion purports to have
terminated the Reseller Agreement, *Morris Silverman Mgmt. Corp.*, 284 F. Supp. 2d at 976.
Accordingly, CareFusion's motion for summary judgment must be and is denied with respect to
this theory of breach.

### b.  Marketing of HealthSight

Next, Medacist alleges that CareFusion breached the exclusivity provisions set forth in
Section 2.3 of the Reseller Agreement through its marketing and sales efforts with respect to
HealthSight.  *See* TAC ¶ 40(c); ECF No. 83 ("Medacist's SJ Opp'n & Cross"), at 16-18.[5]  There
are two relevant provisions in Section 2.3.  One provides that "CareFusion shall not . . . sell or
resell any other technology, service or combination thereof . . . that competes with, or would,
with reasonable likelihood, displace or distract from sales of Subscriptions to the RxA Solution."

---

[5]     In its memorandum of law, Medacist references not only Section 2.3 of the Reseller
Agreement, but also Section 3.1, which required CareFusion to "dedicate a commercially
reasonable, mutually agreeable amount of time and effort to market and sell . . . the RxA
Solution."  Reseller Agreement § 3.1; *see* Medacist's SJ Opp'n & Cross 18.  The Complaint,
however, makes no reference to Section 3.1, and a party may not amend its complaint through its
memorandum of law opposing summary judgment.  *See, e.g.*, *Isaac v. City of New York*, 701 F.
Supp. 2d 477, 491 (S.D.N.Y. 2010).  Accordingly, the Court need not and does not consider
whether CareFusion violated Section 3.1 of the Reseller Agreement.

Reseller Agreement § 2.3.  The second is that "the RxA Solution shall be the only automated drug diversion reporting and analytics solution rights which are directly or indirectly sold, re-sold or recommended for use by CareFusion . . . in connection with the CF Offering."  *Id.*

If CareFusion's February 1, 2018 letter was a valid and effective notice of termination and the Reseller Agreement terminated on November 12, 2018, CareFusion would be entitled to judgment on this theory of breach.  For starters, the first provision, by its terms, applies only to the sale or resale of a competing technology, and there is no evidence in the record that CareFusion actually sold (or resold) HealthSight prior to November 12, 2018.  Medacist argues that this reading of the Agreement is too "simplistic" given "the nature of the sales process involved in securing multi-year commitments" and the "extended sales pipeline" for the products at issue.  Medacist's SJ Opp'n & Cross 17.  It argues instead that the provision should be read to prohibit demonstrations and other efforts to solicit sales, which would encompass some of CareFusion's conduct prior to November 12, 2018, including its demonstrations at the ASHP conference in December 2017.  *See id.*  But the Court's task is to enforce "the plain meaning of the language employed" in the parties' agreement, *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted), and the terms "sell" and "resell" cannot be stretched to include marketing, solicitation, or other acts to secure a later sale.  That conclusion is reinforced by the fact that *other* provisions of the Reseller Agreement do explicitly encompass not only sales, but also marketing, solicitation, and the like. *See* Reseller Agreement § 3.2(b) (prohibiting certain acts of "solicit[ation]"); Schedule 3.2(b)(2)(a), at 53 ("CareFusion shall not sell or market to, pursue, solicit or engage, either directly or indirectly . . . ."); *id.* 9.4, at 78 ("CareFusion is prohibited, directly or indirectly, [sic] selling or marketing to, pursuing, soliciting or engaging . . . .").  As the Second Circuit has held,

"where contract provisions use different language, courts must assume the parties intended different meanings."  *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309 (2d Cir. 2016).

Although the other relevant provision in Section 2.3 does extend beyond sales to "recommend[ations]," it would not support Medacist's claim if the Reseller Agreement was terminated on November 12, 2018 either.  Significantly, the second provision states that "the RxA Solution shall be the only automated drug diversion reporting and analytics solution rights which are directly or indirectly sold, re-sold or recommended for use by CareFusion . . . *in connection with the CF Offering*."  Reseller Agreement § 2.3 (emphasis added).  By its terms, therefore, the prohibition on "recommend[ing]" competitive products "for use" is restricted by the clause "in connection with the CF Offering."  *Id.*  The CF Offering is defined, in turn, to be a specific automated medication dispensing system and analytics called the Knowledge Portal for the Pyxis MedStation.  *See id.* § 1.  If CareFusion recommended HealthSight for use in connection with the Knowledge Portal for the Pyxis MedStation during the life of the Reseller Agreement, it presumably ran afoul of this provision of Section 2.3.  But there is no evidence in the record suggesting that it did so prior to November 12, 2018; indeed, Medacist does not dispute that the "HealthSight concept . . . was not part of the CF Offering until after termination on November 12, 2018."  CareFusion's SJ Br. 14 n.9.

In short, if the Reseller Agreement was validly terminated on November 12, 2018, CareFusion would be entitled to judgment on Medacist's claim that it breached the exclusivity provisions of Section 2.3.  But because the question of whether the Reseller Agreement was validly terminated on November 12, 2018, remains open, CareFusion's motion for summary judgment with respect to Medacist's Section 2.3 claims must be denied as well.

### c. Soliciting House Accounts

Third, Medacist alleges that CareFusion breached the Reseller Agreement by "[s]oliciting, marketing to, and/or selling to House Account customers." TAC ¶ 40(e). Once again, there are two relevant provisions of the Reseller Agreement. First, Section 3.2(b) states that, "[a]s part of both the General Marketing Plan and/or Customer Upgrade Plan," entities "designated on Schedule 3.2(b)as [sic] . . . 'House Accounts'" could "not be solicited" by CareFusion. Reseller Agreement § 3.2(b). And second, Schedule 3.2(b) provides as follows: "Notwithstanding anything to the contrary in this Schedule or the Agreement, CareFusion shall not sell or market to, pursue, solicit or engage, either directly or indirectly, any of the . . . House Accounts . . . at any time . . . ." Schedule 3.2(b)(2)(a), at 53. CareFusion argues that although the latter provision, on its face, broadly prohibited the solicitation of the House Accounts, it should be read in light of Section 3.2(b), which itself should be read to limit only those solicitations made "[a]s part of" the General Marketing Plan and Customer Upgrade Plan — defined terms relating specifically to the RxA Solution. Thus, CareFusion argues, the provisions, taken together, merely restricted its right to solicit the House Accounts as part of the RxA Solution program; they placed no restrictions on its right to solicit the House Accounts beyond that setting or with respect to other products such as HealthSight. CareFusion's SJ Reply & Opp'n 16-17.

CareFusion's argument is unpersuasive for two reasons. First, it is hard, if not impossible, to square with the opening words of Schedule 3.2(b)(2)(a): "Notwithstanding anything to the contrary in this Schedule or the Agreement . . . ." Schedule 3.2(b)(2)(a), at 53. In light of these words, whatever limitations may appear in *Section* 3.2(b) cannot be read into *Schedule* 3.2(b), as CareFusion suggests. Second, at a minimum, the Reseller Agreement cannot

be read to unambiguously limit solicitation in the manner that CareFusion contends.  Put differently, at most, CareFusion's argument would suggest an ambiguity in the Reseller Agreement.  On the one hand, Schedule 3.2(b) appears to prohibit *any* solicitation of House Accounts — a reading bolstered by the fact that Schedule 3.2(b)(2)(b) also states that House Accounts will be subject to the 180-day post-termination non-compete found in Schedule 9.4, which is not subject to the General Marketing Plan and Customer Upgrade Plan or limited to any specific product.  On the other hand, Section 3.2(b) appears to limit any prohibition on solicitation to conduct that is "part of" the General Marketing Plan and the Customer Upgrade Plan — a limitation that would arguably make sense in light of evidence that some House Accounts were also "long-standing" CareFusion customers to whom CareFusion had sold "hundreds and thousands of products" even before the Reseller Agreement.  ECF No. 98-7, at 202.  "[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment."  *Postlewaite*, 411 F.3d at 67 (quoting *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 175 (1st Dep't 1995)).

Thus, CareFusion's motion must be and is denied as to this theory of breach as well.

**d.  Competing Post-Termination**

Medacist alleges that CareFusion also breached a provision of the Reseller Agreement that prohibited the latter from engaging in certain forms of competition with the RxA Solution for a period of 180 days following any voluntary termination.  Specifically, Schedule 9.4 of the Reseller Agreement precludes CareFusion from "selling or marketing to, pursuing, soliciting or engaging," either directly or indirectly, certain customers for 180 days if CareFusion terminates the Reseller Agreement for convenience, as it did here (assuming, of course, the termination was

valid).  Schedule 9.4, at 78.  To the extent relevant here, two categories of customers are covered

by this non-compete provision: first, it extended to a list of customers that Medacist was required

to place in escrow within fifteen days of the Reseller Agreement's effective date, *see id.*; and

second, it applied to the entities designated on Schedule 3.2(b) as "House Accounts," *id.*

3.2(b)(2), at 53.  There is a fatal flaw in Medacist's claim to the extent it is based on the former

— namely, Medacist never placed a list of customers in escrow.  By contrast, the claim cannot be

resolved on summary judgment to the extent that it concerns the House Accounts.

       First, CareFusion is entitled to summary judgment with respect to this theory of breach to

the extent it is based on the list that was to be escrowed.  Under New York law, "[a] condition

precedent is an act or event . . . which, unless the condition is excused, must occur before a duty

to perform a promise in the agreement arises."  *Oppenheimer & Co. v. Oppenheim, Appel, Dixon

& Co.*, 86 N.Y.2d 685, 690 (1995) (internal quotation marks omitted).  A condition precedent

can either be express, in which case it must be "literally performed," or implied, in which case

"substantial compliance is sufficient."  *Id.*  With respect to the post-termination non-compete

provision at issue, the Reseller Agreement contained an express condition precedent: Medacist

was required, within fifteen days of the Reseller Agreement's effective date, to place the relevant

list of customers in escrow.  *See* Schedule 9.4, at 78.  It is undisputed, however, that Medacist

failed to comply with this requirement.  *See* CareFusion's 56.1 Resp. ¶ 28; ECF No. 91-1, at 60.

It is immaterial whether Medacist created its list at the time it entered the Agreement, as it

insists.  *See id.* at 60-61.  It did not place the list in escrow, as required by the plain terms of the

Agreement, and did not provide the list to CareFusion until close to one year after CareFusion's

putative termination of the Agreement, during discovery.  *See* CareFusion's 56.1 Resp. ¶ 28.

That is neither literal performance nor substantial compliance.

Medacist argues that it should be excused from compliance with the escrow requirement because compliance would have been "futile."  Medacist's SJ Opp'n & Cross 19.  But this argument is unconvincing.  Although there is authority to suggest that a party can be excused from satisfying a condition precedent when the other party's conduct renders satisfaction of the condition futile, *see, e.g.*, *CIBC Bank & Tr. Co. (Cayman) Ltd. v. Banco Cent. do Brasil*, 886 F. Supp. 1105, 1113 (S.D.N.Y. 1995); *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 522 N.Y.S.2d 292, 293 (3d Dep't 1987), CareFusion did not do anything of the sort here within fifteen days of the Reseller Agreement's effective date, when Medacist was required to comply.  Additionally, where a party relies on its counterparty's repudiation as an excuse to not perform, that repudiation "must be clear and unequivocal."  *Garcia v. Chase Manhattan Bank, N.A.*, 735 F.2d 645, 648 (2d Cir. 1984).  Here, there is no basis to conclude that CareFusion's conduct or statements constituted a clear and unequivocal disavowal of its obligations under Schedule 9.4.

Medacist is on firmer ground in arguing that CareFusion cannot invoke its failure to comply with the condition precedent as a defense because CareFusion's Answer does not plead the defense "with particularity," as required by Rule 9(c) of the Federal Rules of Civil Procedure.  *See* Medacist's SJ Opp'n & Cross 18-19.  At most, CareFusion alleges in its Answer that "Medacist's claims are barred due to breach of contract by Medacist," ECF No. 61, at 11, but this does not satisfy Rule 9(c).  *See, e.g.*, *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 352 (D. Conn. 2015).  That said, the Court concludes that, under Rule 15(a) of the Federal Rules of Civil Procedure, it can and should grant CareFusion leave to amend its Answer to plead the defense to conform with its arguments on summary judgment.  *See, e.g.*, *id.* at 354 (treating a party's arguments about the failure of a condition precedent as a motion to amend its answer and granting the motion); *see also Saks v. Franklin Covey Co.*, 316

F.3d 337, 350-51 (2d Cir. 2003) (stating that a court may entertain an affirmative defense "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings" by construing a motion for summary judgment as a motion to amend the answer); *Block v. First Blood Assocs.*, 988 F.2d 344, 350-51 (2d Cir. 1993) (holding that a district court did not abuse its discretion under Rule 8(c) of the Federal Rules of Civil Procedure when it *sua sponte* granted a party leave to amend its pleadings after the party raised an affirmative defense for the first time on summary judgment).[6]  "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block*, 988 F.2d at 350.  Here, there is no suggestion, let alone evidence, of bad faith.  And considering whether allowing the defense would (1) require Medacist to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent Medacist from bringing a timely action in another jurisdiction, *see id.*, the Court concludes that Medacist does not demonstrate prejudice.  Among other things, Medacist's compliance with the condition precedent (or lack thereof) has already been the subject of discovery and was well-known to the parties even before the filing of this litigation.  *See, e.g.*, ECF No. 91-34.  Accordingly, the Court will permit CareFusion to amend its Answer to conform to its motion for summary judgment and, on that basis, grants summary judgment to CareFusion with respect to Medacist's claim of breach to the extent it is based on the list to be escrowed.

---

[6]      Although *Block* involved the failure to plead an affirmative defense as required by Rule 8(c), not Rule 9(c), its analysis and conclusion are nonetheless instructive here.  *See, e.g.*, *Odyssey Reinsurance Co*., 123 F. Supp. 3d at 354; *Int'l Paving Sys., Inc. v. Van-Tulco, Inc*., 866 F. Supp. 682, 691 (E.D.N.Y. 1994).

By contrast, CareFusion is not entitled to summary judgment with respect to Medacist's claim that it breached the post-termination non-compete with respect to the House Accounts. Medacist's SJ Opp'n & Cross 20.  Unlike the customers discussed above, with respect to which delivery of Medacist's list into escrow was a condition precedent to CareFusion's non-compete obligations, House Accounts were themselves listed in Schedule 3.2(b).  Thus, CareFusion was obligated to refrain from "directly or indirectly[] selling or marketing to, pursuing, soliciting[,] or engaging" the House Accounts for 180 days following its voluntary termination.  Schedule 9.4, at 78.  As discussed above, the effective date of any termination here is an open question.  And the record reveals several instances in which a reasonable jury could — after resolving the date of termination — conclude that CareFusion violated the non-compete in its interactions with House Accounts.  For example, on November 12, 2018 — the date CareFusion maintains it successfully terminated the Reseller Agreement — CareFusion sent a letter to RxA subscribers informing them that CareFusion had developed its own diversion solution.  ECF No. 75-40, at 2. A reasonable jury could conclude that the recipients of these letters included House Accounts and that, by inviting them to purchase HealthSight instead of RxA Solution, CareFusion breached the non-compete provisions of Schedule 9.4.  Additionally, a CareFusion employee testified that CareFusion sold HealthSight to a House Account sometime between January and October 2019, ECF No. 91-32, at 174, which — depending on the effective date of termination — could fall within the 180-day non-compete window.[7]  Accordingly, CareFusion's motion must be and is denied to the extent Medacist alleges it breached the post-termination non-compete provisions with respect to the House Accounts.

---

[7]      CareFusion argues that this House Account is a specific hospital, the name of which is used imprecisely to refer to other hospitals that form part of the same hospital system but are not House Accounts.  CareFusion's SJ Reply & Opp'n 17 n.9.  But a jury could conclude otherwise.

### e.  Unilateral Modification of the Subscription Agreements

To the extent relevant here, Medacist's final contract claim is that CareFusion breached the Reseller Agreement by "[d]irecting communications to RxA Solution subscribers containing materially inaccurate information and purporting to unilaterally modify the terms of signed RxA Subscription Agreements."  TAC ¶ 40(g).  Section 4.2 of the Reseller Agreement states that RxA Subscription Agreements "shall not be modified without Medacist's prior written consent, which shall not be unreasonably withheld, conditioned or delayed."  Reseller Agreement § 4.2; *see also id.* (providing that Medacist and CareFusion "shall agree, in writing, in advance, to any changes to the form or substance" of the subscription agreements).  Section 9.1, meanwhile, states that an early termination by CareFusion "will not impact signed RxA Subscription Agreements and support thereof."  Reseller Agreement § 9.1; *see also id.* § 9.4 (providing that CareFusion would have certain continuing obligations toward subscribers even after termination).  Pointing to these provisions, Medacist objects to CareFusion's unilateral decision — undisputed in the record — to inform subscribers that their "five-year RxAuditor term will not automatically renew when [they] expire[]."  ECF No. 75-40, at 2.  Medacist argues that this constituted an improper unilateral modification of the subscription agreements, which provided for automatic renewal unless the subscribers opted out, Schedule 4(3), at 66-67.

Given the plain language of the Reseller Agreement and the undisputed facts, the Court concludes that summary judgment is appropriate on this theory — but in favor of Medacist, not CareFusion.  *See, e.g.*, *Jian Yang Lin v. Shanghai City Corp.*, 950 F.3d 46, 49 (2d Cir. 2020) (per curiam) (noting that a court has the discretion to grant summary judgment *sua sponte* when the nonmoving party "has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried" (internal quotation marks omitted)).  That conclusion

follows from two undisputed facts.  First, by informing subscribers that their subscription agreements would *not* automatically renew, contrary to the plain terms of those agreements, CareFusion "modified" the agreements.  And second, CareFusion did not obtain Medacist's "prior written consent" for such modification.  That is a straightforward violation of Section 4.2's plain terms, which unambiguously provided that the subscription agreements "shall not be modified without Medacist's prior written consent."  Reseller Agreement § 4.2.

Notably, CareFusion does not really argue otherwise.  Instead, the premise of its motion is that the modifications were justified — indeed, necessary — in light of its early termination of the Reseller Agreement.  The automatic renewal provisions of the subscriber agreements, CareFusion argues, "could no longer be operative" because, as a result of the early termination, it was no longer authorized to act as a "reseller" of the RxA Solution.  CareFusion's SJ Reply & Opp'n 20.  Indeed, the argument goes, if the automatic reseller provisions remained operative, CareFusion would have been in a "legal Catch-22," forced to choose between two breaches of the agreement: unilaterally amending the subscription agreements or continuing to license the RxA Solution.  *Id.*  But that argument is specious.  Section 9.1 — which authorized CareFusion's early termination — explicitly provides that such early termination "will not impact signed RxA Subscription Agreements and support thereof."  And under Section 9.4, CareFusion had continuing obligations toward subscribers even after termination.  Had CareFusion continued to service the subscriber agreements as written, therefore, it would not have been breaching the Reseller Agreement by improperly acting as a "reseller"; it would have been complying with the Reseller Agreement's plain terms.

CareFusion's argument fails for two other reasons as well.  First, assuming for the sake of argument that early termination of the Reseller Agreement did necessitate a change to the

subscriber agreements, it does not follow that CareFusion had the right to change them unilaterally.  The subscriber agreements were not set in stone — the Reseller Agreement merely provided that any changes required "Medacist's prior written consent" (which could not be unreasonably withheld).  Reseller Agreement § 4.2.  Second, the original term of the Reseller Agreement itself was five years.  *See id.* § 9.1.  That is, unless the parties elected to renew it, the Reseller Agreement would automatically terminate after five years.  Notably, however, the subscription agreements — which CareFusion began selling *after* the Reseller Agreement was effective — were also five-year commitments.  *See* Schedule 4(3), at 66-67.  Thus, in the normal course of events, the subscription agreements were set to expire *after* the Reseller Agreement was terminated, unless the parties agreed to extend the latter.  Under CareFusion's proposed reading, then, the automatic renewal of the subscription agreements would, absent renewal of the Reseller Agreement, be rendered largely meaningless.  Under New York law, however, courts are to "avoid[] if possible" any "interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless."  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (internal quotation marks and alterations omitted)).

For these reasons, the Court concludes that Medacist is entitled to summary judgment on this theory of breach.  That is, given the plain language of the Reseller Agreement and the undisputed facts, a reasonable trier of fact would have to conclude that CareFusion unilaterally modified the subscription agreements in violation of the Reseller Agreement.

## 2.  **Medacist's Remaining Claims**

Medacist also brings claims for breach of fiduciary duty, tortious interference with prospective business advantage, and breach of the implied covenant implied covenant of good faith and fair dealing.  *See* TAC ¶¶ 49, 61-68.  CareFusion moves for summary judgment with

respect to all three claims, *see* CareFusion's SJ Br. 17-23, and its motion on these fronts can be addressed relatively swiftly.

### a. Breach of Fiduciary Duty

First, the Court concludes that CareFusion is entitled to summary judgment with respect to Medacist's claim for breach of fiduciary duty. *See* TAC ¶ 49. Under New York law, an essential element of claim for breach of fiduciary duty is that the defendant owed the plaintiff a cognizable duty of care, which the defendant breached. *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 528 (S.D.N.Y. 2013). "Absent extraordinary circumstances . . . , parties dealing at arms' length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation." *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006). Here, the parties dealt with one another at arms' length in a commercial transaction, and the evidence does not support a finding of extraordinary circumstances that would justify holding that CareFusion owed a fiduciary duty to Medacist.

For starters, the Reseller Agreement itself explicitly disavowed any such agency relationship between the parties. *See* Reseller Agreement § 17 ("Nothing in this Agreement is intended to create an agency . . . . [E]ach party is acting as an independent contractor of the other . . . ."). "Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit. Thus, a long line of cases holds that, where contracting parties sufficiently disclaim a fiduciary relationship, none exists." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451-52 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Granted, such a disclaimer is not, by itself, dispositive. *See, e.g.*, *id.* at 452-53. But other aspects of the relationship make plain that it was not one of "higher trust." *Id.* at 452 (internal quotation marks omitted). Most notably, CareFusion was "solely responsible for

establishing the retail fee" that subscribers would be charged.  Reseller Agreement § 8.1.

CareFusion was also free to develop its own competing products so long as it did not sell them.

*Id.* § 2.3.  In light of these provisions, taken together, no reasonable jury could find that

CareFusion was "under a duty to act for or to give advice for the benefit of [Medacist] upon

matters within the scope of the relation."  *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F.

Supp. 2d 428, 442 (S.D.N.Y. 2010) (Chin, J.) (quoting *Mandelblatt v. Devon Stores, Inc.*, 21

N.Y.S.2d 672, 676 (1st Dep't 1987)); *see also*, *e.g.*, *Hyosung Am., Inc. v. Sumagh Textile Co.*,

No. 94-CV-568 (SAS), 1996 WL 499346, at *6 (S.D.N.Y. Aug. 30, 1996) (noting that "the most

essential element to a finding of an agency relationship is control" and finding no fiduciary

relationship where the alleged agent exercised "complete discretion in" selecting customers and

"negotiating purchase orders and prices for goods"), *aff'd in part, rev'd in part*, 137 F.3d 75 (2d

Cir. 1998).  Accordingly, CareFusion is granted summary judgment with respect to Medacist's

claim for breach of fiduciary duty.[8]

### b.  Tortious Interference with Prospective Business Advantage

By contrast, CareFusion's motion must be denied with respect to Medacist's claim for

tortious interference with prospective business advantage.  TAC ¶¶ 61-66.  Under New York

law, the elements of such a claim are: (1) a business relationship between the plaintiff and a third

party; (2) defendant's knowledge of that relationship and intentional interference with it;

(3) proof that the defendant acted with the sole purpose of harming the plaintiff or used

dishonest, unfair, or improper means; and (4) injury to the relationship.  *See Kirch v. Liberty*

*Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).  CareFusion argues, first, that Medacist has

---

[8]      In light of that conclusion, the Court need not and does not reach CareFusion's
alternative argument that Medacist's fiduciary duty claim is duplicative of its contact claim.

failed to identify any legally cognizable prospective business relationship with a third party. CareFusion's SJ Br. 21.  But Medacist need only demonstrate "a reasonable probability of entering into a business relationship with a third party" to satisfy this element, *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 239 (S.D.N.Y. 2018), and the record allows a reasonable jury to infer the existence of such a probability.  To provide but one example: In October 2018, CareFusion personnel noted that a potential customer was going to purchase a subscription to the RxA Solution unless CareFusion was able to promptly pitch its own competing product.  *See* ECF No. 91-48, at 3-4.

Next, CareFusion argues that no evidence could support a finding that its conduct was for the sole purpose of harming Medacist or that it used "dishonest, unfair[,] or improper means." *Kirch*, 449 F.3d at 400; *see* CareFusion's SJ Br. 21-22.  The Court disagrees.  A reasonable jury could find that CareFusion's conduct was independently tortious, which is enough to satisfy this element of the claim.  *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) (holding that to support a claim for tortious interference, a plaintiff may show either that the defendant's conduct was for the sole purpose of inflicting intentional harm on the plaintiff or amounted to "a crime or an independent tort").  Indeed, Medacist points to at least two examples that could support a conclusion that CareFusion made false and misleading statements to subscribers: (1) a December 5, 2018, email in which CareFusion indicated that it had agreed to "rip up" a subscription "that hasn't been counter-signed in order to" have the customer sign up for HealthSight instead, ECF No. 91-50, at 1, and (2) emails from October 16 and 17, 2018, indicating that CareFusion personnel had tried to "buy some time" with a customer who was otherwise prepared to purchase the RxA Solution.  ECF No. 91-48, at 3-4.  Accordingly, the Court denies CareFusion's request

for summary judgment on Medacist's claim for tortious interference with prospective business advantage.

### c.  Breach of the Implied Covenant of Good Faith and Fair Dealing

So too, CareFusion's motion with respect to the claim for breach of the implied covenant of good faith and fair dealing can be swiftly rejected.  The covenant of good faith and fair dealing, which is implied in all contracts, "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (internal quotation marks omitted).  More specifically, it encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."  *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 214 (S.D.N.Y. 2007) (internal quotation marks omitted).  Thus, "conduct that while technically not constituting a breach of contract, nevertheless deprives the plaintiff of the benefit of its bargain" can constitute a breach of the implied covenant.  *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2017 WL 3600427, at *4 (S.D.N.Y. Aug. 18, 2017) (internal quotation marks omitted).  Here, drawing all inferences in Medacist's favor, there is sufficient evidence to support such a claim.  In particular, there is evidence to support an inference that CareFusion purposely delayed some RxA Solution sales so as to give it an opportunity, following its purported early termination of the Reseller Agreement, to sell its own product, HealthSight, instead.  *See, e.g.*, ECF No. 91-41, at 1 (David Brzozowski stating that a potential customer has been "waiting on a cost estimate for RxA" from CareFusion); ECF No. 91-48, at 3-4 (CareFusion personnel seeking to "buy some time" with a customer that was otherwise ready to subscribe to RxA Solution).  Although such conduct may not have been

expressly prohibited by the Reseller Agreement, a reasonable jury could find that Medacist was thereby deprived of the fruit of its bargain, and thus summary judgment on this claim is not appropriate.

### 3. The Limitation-of-Liability Provision

Finally, to the extent the Court does not grant summary judgment with respect to all of Medacist's claims — and it does not — CareFusion moves to enforce a limitation-of-liability provision in the Reseller Agreement. Specifically, Section 13 provides that each party's total liability for any claim in connection with the Agreement, "under whatever theory brought," is limited to direct damages in an amount equivalent to the fees actually received by Medacist during the twelve months immediately preceding the assertion of the claim. Reseller Agreement § 13. Significantly, however, the provision contains a carve-out for any claim brought "in connection to . . . the gross negligence or willful misconduct of a party." *Id.* And here, a reasonable jury could conclude that at least some of CareFusion's conduct amounted to "gross negligence" or "willful misconduct." That includes, for example, the conduct discussed above in connection with Medacist's tort-based claims: CareFusion's indication on one occasion that it would "rip up" a subscriber's RxA Solution subscription agreement, *see* ECF No. 91-50, at 1, and its efforts, on another occasion, to "buy some time" so that a customer could purchase HealthSight, its own product, instead of the RxA Solution, ECF No. 91-48, at 3-4. To the extent that a jury were to find CareFusion liable "in connection to" such conduct, it could also conclude that the limitation-of-liability provision does not, by its terms, apply.

Separate and apart from its argument relating to the limitation-of-liability provision, CareFusion contends that Medacist has failed to provide direct evidence that it "lost a single possible sale" because of CareFusion and, thus, that it cannot show it suffered "legally

cognizable damages" without relying on speculation or "unreliable expert testimony." CareFusion's SJ Br. 23.  As discussed below, however, the Court will not exclude the testimony of Medacist's damages expert, which could allow a jury to find that Medacist suffered damages as a result of CareFusion's conduct.  *See, e.g.*, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10-CV-5762 (PAE), 2016 WL 3098842, at *16-17 (S.D.N.Y. June 1, 2016) (denying summary judgment where an expert report presented evidence of damages).  Moreover, "[n]ominal damages are always available in breach of contract actions."  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020) (quoting *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993)); *see, e.g.*, *NAF Holdings*, 2016 WL 3098842, at *17-18; *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (Chin, J.).  Thus, CareFusion's motion for summary judgment is denied on that score.

## C.  Medacist's Summary Judgment Motion

With that, the Court turns to Medacist's cross-motion for summary judgment with respect to CareFusion's two counterclaims, for breach of contract and for breach of the implied covenant of good faith and fair dealing.  *See* Counter-Compl. ¶¶ 13-17.  CareFusion's claims arise from the same core allegation: that Medacist failed to provide prompt notification, in violation of the OTC Process, when it had installed the RxA Solution with a new subscriber, which resulted in the delayed collection of fees due to CareFusion.  *Id.* ¶¶ 8-9.  CareFusion does not argue that the OTC Process was a document executed by both parties, and there is no evidence in the record suggesting it was.  Nevertheless, relying primarily on Lorraine Brzozowski's testimony that CareFusion and Medacist "founded" the OTC Process, CareFusion argues that the OTC Process was an enforceable contract that binds Medacist.  CareFusion's SJ Reply & Opp'n 27-28.

That argument is unpersuasive.  When evaluating whether parties intended to be bound in the absence of a document executed by both sides, a court is to consider "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Winston v. Mediafare Entm't Corp*., 777 F.2d 78, 80 (2d Cir. 1985).  Where the parties have entered a written agreement containing an integration clause, there is a "strong presumption" against finding an agreement to be bound by something beyond the written agreement itself.  *Lee v. Joseph E. Seagram & Sons, Inc*., 552 F.2d 447, 452 (2d Cir. 1977).  Here, the parties' written agreement — the Reseller Agreement — did contain an integration clause, *see* Reseller Agreement § 18 (providing that the Reseller Agreement was the "entire agreement between the parties" and that it could not "be modified except by written agreement referencing the Sections or Articles modified"), and CareFusion does not come close to overcoming the presumption.  Lorraine Brzozowski's remark that CareFusion and Medacist "founded" the OTC Process certainly does not cut it — particularly since she added that the OTC Process was "mostly" CareFusion's protocol.  *See* ECF No. 98-6, at 126-27.  And whatever role Medacist may have played in creating the OTC Process, CareFusion identifies no documentation or other evidence suggesting, let alone showing, that Medacist agreed to be bound by it.  That absence is particularly noteworthy given CareFusion's sophistication.  *Cf. End Line Inv'rs, Ltd. v. Wells Fargo Bank, N.A.*, No. 16-CV-7009 (PGG), 2018 WL 3231649, at *5 (S.D.N.Y. Feb. 27, 2018) (finding that an alleged collateral contract was not effective because, *inter alia*, the parties were sophisticated and would have been expected to memorialize agreements in writing).

That conclusion is fatal not only to CareFusion's counterclaim for breach of contract, but also to its counterclaim for breach of the implied covenant of good faith and fair dealing.  The covenant of good faith and fair dealing, after all, is implied in *contracts*.  *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).  Thus, absent a valid contract, Medacist cannot be held liable for breach of the implied covenant.  *See, e.g.*, *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (holding that an implied-covenant claim fails in the absence of an express contract).  CareFusion does tether its claim to the Reseller Agreement as well, *see* Counter-Compl. ¶ 17, but that does not change the result. The implied covenant of good faith and fair dealing is breached "only in a narrow range of cases," and the claimant, in demonstrating bad faith, "must show substantially more than evidence that the [counterparty's] actions were negligent or inept."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014).  Here, there is no evidence in the record that any delays by Medacist in notifying CareFusion of RxA Solution installations were in bad faith. CareFusion points to evidence that Lorraine Brzozowski initially blamed a fictitious employee for falling behind on the notifications, *see* ECF No. 91-55, at 2, only to admit later that she was responsible and had invented the employee to deflect blame, *see* ECF No. 98-6, at 152.  But the fact that Lorraine Brzozowski tried to deflect blame *after the fact* is no evidence that she acted with bad faith when failing to promptly notify CareFusion in the first place.

In short, Medacist is entitled to summary judgment on both of CareFusion's counterclaims.

## MOTIONS TO PRECLUDE EXPERT TESTIMONY

Both Medacist and CareFusion also move to exclude expert opinions and testimony pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  CareFusion seeks to exclude in its entirety the

opinions of Medacist's proposed damages expert, Gregory Cowhey.  ECF No. 72.  Medacist

seeks to exclude in its entirety the opinions of Dr. Alyson L. Wooten and certain opinions of

Gregory E. Smith.  ECF No. 85.[9]  After reviewing the legal standards governing *Daubert*

motions, the Court will address each proposed expert in turn.

## A.  Legal Standard

The admissibility of expert testimony is governed by Rule 702, which provides, in

relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience,

training, or education may testify" to his or her opinion if:

    (a)  the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)  the testimony is based on sufficient facts or data;

    (c)  the testimony is the product of reliable principles and methods; and

    (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert*, the Supreme Court emphasized the "gatekeeping role" of district

courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule

702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  "The Rule 702 inquiry

is a flexible one that depends upon the particular circumstances of the particular case at issue."

*In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2

(S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted).  "Although a district court should

---

[9]     To the extent that the parties also move to strike the opposing experts' reports themselves, the motions are effectively moot as the Court did not rely on the reports in reaching its conclusions on the cross-motions for summary judgment.  Moreover, the reports themselves are hearsay and would not be admitted into evidence at any trial.

admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *Id.* (internal quotation marks omitted); *see also Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005) ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ."). Further, "although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks and alterations omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

## B.  CareFusion's Motion to Exclude

Cowhey, Medacist's proposed damages expert, proffers calculations for four categories of damages: (1) damages relating to CareFusion's sale of competing products; (2) damages relating to CareFusion's solicitation and marketing of competing products to House Accounts; (3) damages relating to CareFusion's solicitation and marketing of competing products to Medacist customers within 180 days of termination; and (4) damages relating to CareFusion's solicitation and marketing of competing products to non-Medacist customers within 180 days of termination. *See* ECF No. 73-1 ("Cowhey Report"), at 5. CareFusion does not argue that Cowhey — a principal at a national accounting firm who has offered expert testimony in dozens of commercial matters in both state and federal litigation, *see* Cowhey Report app. B — lacks qualifications to provide expert testimony as to Medacist's alleged damages. Nevertheless, CareFusion argues that Cowhey's opinions should be excluded for two reasons: First, he

impermissibly focuses on disgorgement; and second, his methodology is flawed and unreliable. ECF No. 74 ("CareFusion's Daubert Br."), at 3.  The Court finds that exclusion of Cowhey's opinions would be inappropriate and, thus, denies CareFusion's motion to exclude.

First, CareFusion challenges Cowhey's opinions on the ground that they seek to measure disgorgement and, thus, are irrelevant to the claims asserted in this case.  *Id.* at 22-24.  Medacist is certainly correct that disgorgement — an equitable remedy measuring the defendant's wrongful gain, *see Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943 (2020) — is not the proper remedy in a breach-of-contract case.  CareFusion's Daubert Br. 4; *see Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005).  But Cowhey did not use the term in its technical legal sense.  *See, e.g.*, ECF No. 90-1, at 68-70.  Instead, as Cowhey himself testified during his deposition, he used the term to refer to *Medacist's* profits.  *Id.* at 68; *see also* Cowher Report 9 (referring to "Medacist's disgorged revenue").  That use of the term is certainly unorthodox and could cause one schooled in the law of remedies confusion, but that does not justify excluding Cowhey's testimony altogether, particularly since it is the Court, not the parties or their experts, that will explain the proper measure of damages to the jury.  Put differently, any possible confusion or prejudice can be addressed through appropriate curative instructions.  *See, e.g.*, *Conti v. Doe*, No. 17-CV-9268 (VEC), 2020 WL 6162104, at *12 (S.D.N.Y. Oct. 21, 2020).

Next, CareFusion vigorously challenges several of Cowhey's methodological choices in calculating each category of damages.  A few common complaints emerge: Cowhey's assumption that HealthSight sales and quotes translate reliably into lost RxA Solution sales, CareFusion's Daubert Br. 8-11, 14-20; the use of a transfer pricing ratio of 75% to compute Medacist's imputed portion of HealthSight revenue, *id.* at 11, 16, 19; Cowhey's calculation of Medacist's gross profit margin, *id.* at 12-13, 16, 20; and Cowhey's consideration of customers

whose RxA Solution subscriptions are not yet up for renewal, *id.* at 18-19, 21.  Although Cowhey's methodological choices challenged by CareFusion are open to reasonable debate, none of them "are so unrealistic and contradictory as to suggest bad faith."  *Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted).  Instead, CareFusion's criticisms go to the weight, not the admissibility, of Cowhey's testimony.  *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).  That is, the appropriate way for CareFusion to challenge Cowhey's methodologies here is not categorical exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596.  Notably, CareFusion plans to offer its own expert, Smith, in rebuttal.

Finally, CareFusion also challenges Cowhey's failure to discount future cash flows to present value.  *See* CareFusion's Daubert Br. 22.  The Second Circuit, however, has instructed district courts to distinguish between minor and major flaws in expert testimony.  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible"; by contrast, the Court "should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotation marks omitted).  Here, Medacist argues that there are justifications for not discounting.  ECF No. 87, at 13.  And, in any event, if the failure to discount is a flaw in Cowhey's testimony, it is not a large enough flaw to render Cowhey's testimony *per se* inadmissible.

Accordingly, CareFusion's motion to exclude Cowhey's testimony is denied.

### C.  Medacist's Motion to Exclude

Turning to Medacist's motion, Medacist moves first to exclude Dr. Wooten's testimony in its entirety.  As a preliminary matter, Medacist argues that Dr. Wooten lacks sufficient "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702(a), to offer her proposed testimony on the marketplace for drug diversion analytics.  There is some force to that argument.  Although Dr. Wooten is both an intellectual property lawyer and a pharmacist, she does not appear to have specialized knowledge with respect to the *marketplace* for drug diversion analytics, the primary subject matter of her testimony.  *See, e.g.*, ECF No. 89-2, at 72-74; *see also, e.g.*, *Nimely*, 414 F.3d at 399 n.13 ("[Just] because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").  At the same time, in her training and employment, Dr. Wooten has been exposed to drug diversion programs generally, *see* ECF No. 99-3, at 54, 56, 62; *see also* ECF No. 89-1 ("Wooten Report"), at 2-3, and that provides some basis for her testimony.  Ultimately, therefore, the Court concludes that the proper course is not to exclude Dr. Wooten's testimony altogether, but rather to invite "[v]igorous cross-examination" on her qualifications to offer her opinions in this case.  *Daubert*, 509 U.S. at 596; *cf. Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (holding that a "well-trained [expert] with somewhat more general qualifications" should have been allowed to testify).

At a more specific level, Medacist challenges two opinions that Dr. Wooten plans to offer with respect to the issues remaining in this case: (1) that in recent years, including since the Reseller Agreement has been in place, the market for diversion analytics technology has become more competitive; and (2) that, since the date of CareFusion's termination of the Reseller Agreement, Medacist has had "ample opportunity" to mitigate potential losses by contacting

customers directly.  *See* Wooten Report 4.[10]  Contrary to Medacist's suggestion, the first opinion

is relevant in assessing Medacist's alleged damages, as the status of the drug diversion analytics

market may bear on how many lost RxA Solution sales, if any, were caused by CareFusion's

alleged conduct.  Nor, as Medacist contends, is it unfairly prejudicial because a jury might be

misled into thinking that the changing market conditions justified CareFusion's allegedly

wrongful conduct.  *See* ECF No. 86 ("Medacist's Daubert Br."), 14.  The Court can address any

such risk through appropriate curative instructions.  And, in any event, the risk of such prejudice

is not "substantial" enough to justify exclusion under Rule 403 of the Federal Rules of Evidence.

*See, e.g.*, *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 151 (2d Cir. 1997) ("As the terms of the Rule

indicate, for relevant evidence to be excluded on this basis, the imbalance must be substantial,

and the prejudice must be unfair." (discussing Rule 403)).

  That said, the Court concludes that Dr. Wooten's extensive reliance on the KLAS Report

— an August 2019 report titled "Drug Diversion Monitoring: An Early Look at Emerging vs.

Established Techniques," *see* ECF No. 89-5 ("KLAS Report") — is improper and, thus, that any

opinions based on the KLAS Report must be excluded.  An expert is allowed to rely on

otherwise inadmissible material "[i]f experts in the particular field would reasonably rely on"

that kind of material.  Fed. R. Evid. 703.  But nothing in the record indicates that the KLAS

Report fits the bill.  *Cf. In re Agent Orange Prod. Liab. Litig*., 611 F. Supp. 1223, 1246

---

[10] Medacist also challenges Dr. Wooten's proffered testimony that CareFusion's "demoing" of HealthSight was distinct from selling or recommending the technology for sale.  *Id.*  That testimony is indeed problematic because whether "demoing" a product constitutes a sale or resale within the meaning of the Reseller Agreement is a legal question and, thus, not a proper subject for expert testimony.  *See, e.g.*, *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.").  In light of the Court's summary judgment ruling, however, the issue is moot anyway.

(E.D.N.Y. 1985) (finding it "significant" that none of the proposed experts "assert[ed] that they

normally rely on" the disputed data), *aff'd sub nom. In re Agent Orange Prod. Liab. Litig. MDL*

*No. 381*, 818 F.2d 187 (2d Cir. 1987).  Indeed, nowhere in her expert report or her deposition

does Dr. Wooten assert that she, or experts in the field, reasonably rely on the KLAS Report, or

documents like it, in forming the opinions she offers here.  On top of that, there is reason to

question the reliability of the KLAS Report on its own terms.  Its conclusions about the RxA

Solution are based on only sixteen evaluations from users.  *See* KLAS Report 7 & fig.1.  And

these evaluations were collected over the twelve months preceding August 2019, *id.*, and, thus,

do not necessarily even speak to the relevant time period in this case.  Insofar as Dr. Wooten's

first opinion relies on the KLAS Report, therefore, the Court finds that it "lack[s] good grounds

for . . . her conclusions."  *Amorgianos*, 303 F.3d at 267 (internal quotation marks omitted).  But

she may testify in support of the first opinion to the extent it does not rely on the KLAS Report.[11]

   Dr. Wooten's second opinion, about Medacist's ability to contact subscribers and

potentially mitigate harm, is also inadmissible.  Dr. Wooten opines that it is normal for

companies like Medacist "to communicate with existing and prospective customers in a variety

of ways, including: telephone calls, in person visits, email, social media, advertisements and

marketing at professional conferences and in professional publications, and hard copy brochures

or mailings."  Wooten Report 19.  She adds that "hospital personnel closely monitor subscription

renewal dates (including automatic renewal dates) and would expect that they would be

---

[11]     Apart from its objections to the KLAS Report, Medacist raises only one other objection
to Dr. Wooten's first opinion — namely, that her reliance on the fact that new participants
entered the market for diversion analytics is insufficient to support her conclusion that there was
an increase in demand in the market.  Medacist's Daubert Br. 17.  It is not clear that this is an
accurate characterization of Dr. Wooten's conclusion: She mentions it nowhere in her report and
only in passing in her deposition testimony.  *See* ECF No. 89-2, at 104-05.  In any event, the
remedy for any such reliance is cross-examination, not exclusion.

contacted regarding a renewal." *Id.* at 20.  These are not opinions that fall "within the

witness'[s] scientific, technical, or specialized knowledge."  *Andrews v. Metro N. Commuter*

*R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).  Instead, they are directed to "lay matters which a

jury is capable of understanding and deciding without the expert's help."  *Id.*  Thus, while

CareFusion is free to make the commonsense argument to the jury that Medacist could have

mitigated its damages by calling, emailing, and otherwise contacting hospitals, it may not bolster

that argument by introducing testimony under the guise of Dr. Wooten's expertise.

Given the foregoing, the Court need not dwell long on Medacist's challenge to portions

of Smith's rebuttal expert testimony.  To the extent that Smith's testimony is based on the KLAS

Report, it suffers from the same flaws as Dr. Wooten's testimony and must be excluded for the

same reasons.[12]  The Court will, however, allow Smith to testify regarding purported changes in

the drug diversion analytics market so long as those opinions do not rely on the KLAS Report.

Beyond that, Medacist's sole objection is that Smith improperly relied on the pricing of

HealthSight in concluding that customers place a higher value on the functionality of

HealthSight than that of the RxA Solution.  Medacist's Daubert Br. 17 (citing ECF No. 89-3

¶ 48).  That may be good fodder for cross-examination, but the Court concludes that it is not

grounds for exclusion.

---

[12]    If anything, Smith's deposition testimony confirms that the KLAS Report is *not* the sort
of document on which experts in his and Dr. Wooten's fields would reasonably rely.  He testified
that KLAS would not provide him with a copy of the Report and that he had to get a copy from
CareFusion, which received the Report as a dues-paying member of KLAS.  ECF No. 89-7, at
86-87, 94-95.

**CONCLUSION**

For the reasons stated above, the Court rules as follows:

(1) CareFusion's motion for summary judgment with respect to Medacist's claims is GRANTED in part, namely as to:

    a.  Medacist's breach-of-contract claim on the theory that CareFusion violated the Reseller Agreement's post-termination non-compete with respect to customers that should have been identified by Medacist in the escrowed list; and

    b.  Medacist's breach-of-fiduciary-duty claim.

(2) CareFusion's motion for summary judgment is also DENIED in part, namely as to:

    a.  Medacist's breach-of-contract claims on the theory that CareFusion improperly terminated the Reseller Agreement early, violated the Reseller Agreement's exclusivity provisions, improperly solicited House Accounts, and violated the Reseller Agreement's post-termination non-compete provision with respect to House Accounts;

    b.  Medacist's tortious-interference-with-prospective-business-advantage claim;

    c.  Medacist's breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claim; and

    d.  the limitation-on-liability provision.

(3) Summary judgment is granted to Medacist with respect to its breach-of-contract claim on the theory that CareFusion improperly modified the subscription agreements.

(4) CareFusion is granted leave to file an amended answer to plead with particularity Medacist's failure to comply with the condition precedent requiring it to place a customer list in escrow within fifteen days of the Reseller Agreement's effective date. CareFusion shall file its amended answer (which shall otherwise be identical to its existing Answer) **within two weeks of the date of this Opinion and Order**.

(5) Medacist's motion for summary judgment with respect to both of CareFusion's counterclaims is GRANTED.

(6) CareFusion's motion to exclude Cowhey's testimony is DENIED.

(7) Medacist's motion to exclude the testimony of Dr. Wooten and Smith is DENIED in part and GRANTED in part.

One housekeeping matter remains: The parties filed letter-motions to seal or redact portions of their motion papers.  ECF Nos. 68, 95.[13]  The Court granted the letter-motions temporarily, pending its decision on the underlying motions.  ECF Nos. 76, 102.  It is well established that filings "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted).  Significantly, assessment of whether the presumption in favor of public access is overcome must be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019).  And the mere fact that information is sealed or redacted by agreement of the parties is not a valid basis to overcome the presumption.  *See, e.g.*, *Boyce v. Weber*, No. 19-CV-3825 (JMF), 2020 WL 5209526, at *3 (S.D.N.Y. Sept. 1, 2020).  Accordingly, **no later than two weeks from the date of this Opinion and Order**, any party that believes any materials currently filed under seal or in redacted form should remain filed under seal or in redacted form is ORDERED to show cause in writing, on a document-by-document basis, why doing so would be consistent with the presumption in favor of public access.  If, by that deadline, no party contends that a particular document should remain under seal or in redacted form, then the parties shall promptly file that documents publicly on ECF.  Each party shall ensure that all sealing and redaction requests are made in accordance with Rule 7 of the Court's current Individual Rules and Practices in Civil Cases (and the District's ECF Rules and Instructions, the relevant provisions of which were amended in 2020).

---

[13]    Complicating matters, these filings bridged changes in this District's procedures for filing sealed documents, *see* Standing Order M10-468, No. 19-MC-583 (CM) (S.D.N.Y. Dec. 19, 2019), so some sealed filings were transmitted directly to the Court in hard copy (or via email) and do not appear on the docket while others were filed on the docket with restricted viewing access in accordance with the procedures now in effect.

Finally, the Court will hold a telephone conference on **February 10, 2021**, at **3:45 p.m.**, to address the next steps in this case, including the nature of and deadline for submission of pretrial submissions, the scheduling of trial, and whether settlement is possible.  Counsel should be prepared to address, among other things, (1) whether the parties would consent to a bench trial (whether conducted remotely or in person), mindful that it may be a very long time before a jury trial can be held (given the inability to safely conduct a jury trial now and the many felony criminal trials that will take precedence over this case once jury trials can safely resume); and (2) whether (and if so, when) a settlement conference should be held, with either the designated Magistrate Judge or a mediator.  To access the conference, counsel should call (888) 363-4749 and use access code 542-1540#.  Members of the press and public may call the same number, but will not be permitted to speak during the conference.  The parties are reminded to follow the procedures for teleconferences described in the Court's Emergency Individual Rules and Practices in Light of COVID-19, which are available at https://nysd.uscourts.gov/hon-jesse-m-furman.  Among other things, those procedures require counsel to provide advance notice of who will participate in the conference and the telephone numbers they will use to participate.

The Clerk of Court is directed to terminate Docket Nos. 69, 72, 82, and 85.

SO ORDERED.

Dated: January 28, 2021
      New York, New York
                                   JESSE M. FURMAN
                              United States District Judge